UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

AMASIA C. G.[1],

                    Plaintiff,                    Civil Action No. 25-10599

v.                                       David R. Grand
                                       United States Magistrate Judge[2]

COMMISSIONER OF
SOCIAL SECURITY,

                    Defendant.
_____/

**OPINION AND ORDER ON CROSS-MOTIONS
FOR SUMMARY JUDGMENT (ECF Nos. 10, 12)**

Plaintiff Amasia C. G. ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g), challenging the final decision of Defendant Commissioner of Social Security ("Commissioner") denying his application for Supplemental Security Income ("SSI") under the Social Security Act (the "Act"). Both parties have filed summary judgment motions. (ECF Nos. 10, 12).

For the reasons set forth below, the Court finds that the ALJ's conclusion that Plaintiff is not disabled under the Act is not supported by substantial evidence. Thus, the Commissioner's Motion for Summary Judgment **(ECF No. 12)** will be **DENIED**; Plaintiff's Motion for Summary Judgment **(ECF No. 10)** will be **GRANTED**; and this case

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the United States has recommended that, due to significant privacy concerns in social security cases, federal courts should refer to claimants only by their first names and last initials.

[2] The parties have consented to the undersigned exercising jurisdiction over all proceedings in this civil action pursuant to 28 U.S.C. § 636(c). (ECF No. 7).

will be **REMANDED** to the Commissioner for further proceedings consistent with this Opinion and Order.

### A.     Background

Plaintiff was 39 years old at the time of his application date of October 26, 2021,[3] and at 5'9" tall weighed approximately 270 pounds.  (PageID.110, 266).[4]  He earned his GED but has no further education.  (PageID.267).  He has virtually no past work and has been incarcerated multiple times.  (PageID.64, 66, 249-51, 268, 340).  He now alleges disability primarily as a result of bipolar disorder, schizoaffective disorder, posttraumatic stress disorder ("PTSD"), anxiety, epilepsy, attention deficit hyperactivity disorder ("ADHD"), hypertension, hyperlipidemia, restless leg syndrome, and back pain. (PageID.110, 266).

After Plaintiff's application for SSI was denied at the initial level on June 14, 2022 (PageID.140-43), and on reconsideration on November 3, 2022 (PageID.153-55), he timely requested an administrative hearing, which was held on December 5, 2023, before ALJ Nicole Quandt (PageID.56-76).  Plaintiff, who was represented by attorney Ryan Grusecki, testified at the hearing, as did vocational expert ("VE") Pauline McEachin.  (*Id.*).  On January 22, 2024, the ALJ issued a written decision finding that Plaintiff is not disabled under the Act.  (PageID.38-49).  On January 6, 2025, the Appeals Council denied review.

---

[3] Plaintiff previously filed an application for SSI on May 28, 2017.  (PageID.84).  That claim was denied at the initial level.  (*Id.*).  On November 20, 2018, ALJ Christopher Mattia issued a written decision denying that application.  (PageID.84-95).  On December 2, 2019, the Appeals Council denied review.  (PageID.102-07).

[4] Standalone citations to "PageID.___" are all to the administrative transcript in this case, which can be found at ECF No. 6-1.

(PageID.22-26).  Plaintiff timely filed for judicial review of the final decision on March 4, 2025.  (ECF No. 1).

The Court has thoroughly reviewed the transcript in this matter, including Plaintiff's medical record, disability reports, and testimony as to his conditions and resulting limitations.  Instead of summarizing that information here, the Court will cite to the transcript as necessary in its discussion of the parties' arguments.

**B.      The ALJ's Application of the Disability Framework Analysis**

Under the Act, SSI is available only for those who have a "disability."  *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 1382c(a)(3)(A).  The Commissioner's regulations provide that a disability is to be determined through the application of a five-step sequential analysis:

> Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two: If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.
>
> Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.

> Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.
>
> Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that the claimant can perform, in view of his or her age, education, and work experience, benefits are denied.

*Scheuneman v. Comm'r of Soc. Sec.*, No. 11-10593, 2011 WL 6937331, at *7 (E.D. Mich. Dec. 6, 2011) (citing 20 C.F.R. § 404.1520); *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).  "The burden of proof is on the claimant throughout the first four steps ….  If the analysis reaches the fifth step without a finding that claimant is not disabled, the burden transfers to the [defendant]."  *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

Following this five-step sequential analysis, the ALJ found that Plaintiff is not disabled under the Act.  At Step One, the ALJ found that Plaintiff has not engaged in substantial gainful activity since the application date of October 26, 2021.  (PageID.41). At Step Two, the ALJ found that he has the severe impairments of degenerative disc disease of the lumbar spine, seizure disorder, migraines, obesity, PTSD, a substance-induced mood disorder, an antisocial personality disorder, a schizoaffective disorder, polysubstance dependence, and depression.  (*Id.*).  At Step Three, the ALJ found that Plaintiff's impairments, whether considered alone or in combination, do not meet or medically equal a listed impairment.  (*Id.*).

The ALJ then assessed Plaintiff's RFC, concluding that he is capable of performing light work, with the following additional limitations: can lift and carry 10 pounds frequently and 20 pounds occasionally; can stand or walk for 6 hours in an 8-hour workday;

can sit for 6 hours in an 8-hour workday; can push or pull within the aforementioned weight restrictions; can never climb ladders, ropes, or scaffolds; can occasionally balance, stoop, kneel, crouch, crawl, and climb ramps and stairs; can never have exposure to unprotected heights or moving mechanical parts; can never perform commercial driving; can perform work in a moderate noise intensity level environment; can understand, carry out, and remember simple instructions and make simple work-related decisions; can occasionally interact with supervisors and co-workers; can never interact with the public; can occasionally deal with changes in a routine work setting and perform work that does not require a production line pace, where co-workers' productivity is dependent on his productivity.  (PageID.43).

At Step Four, the ALJ found that Plaintiff has no past relevant work.  (PageID.48). At Step Five, the ALJ determined, based in part on testimony provided by the VE in response to hypothetical questions, that Plaintiff is capable of performing the light work jobs of housekeeper (140,000 jobs in the national economy), inspector (180,000 jobs), and packager (130,000 jobs).  (PageID.49).  As a result, the ALJ concluded that Plaintiff is not disabled under the Act.  (*Id.*).

### C.     Standard of Review

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g).  Judicial review under this statute is limited in that the court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record."  *Longworth v.*

*Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal citations omitted).  The phrase "substantial evidence" is a "term of art …."  *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal citations omitted).  "Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains 'sufficien[t] evidence' to support the agency's factual determinations."  *Id*. (internal citations omitted).  "And whatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high.  Substantial evidence …  is 'more than a mere scintilla.'"  *Id.* (internal citations omitted).  Specifically, "[i]t means – and means only – 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Id.* (internal citations omitted).

When reviewing the Commissioner's factual findings, the court is limited to an examination of the record and must consider the record as a whole.  *See Bass v. McMahon*, 499 F.3d 506, 512-13 (6th Cir. 2007); *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992).  The court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council," or in this case, the ALJ.  *Heston*, 245 F.3d at 535; *Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989).  There is no requirement, however, that either the ALJ or this court discuss every piece of evidence in the administrative record.  *See Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all evidence without directly addressing in his written decision every piece of evidence submitted by a party.") (internal quotations omitted).  If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if

substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (citations omitted).

### D. Analysis

As set forth above, the ALJ found that Plaintiff has the severe mental impairments of PTSD, a substance-induced mood disorder, an antisocial personality disorder, a schizoaffective disorder, polysubstance dependence, and depression. (PageID.41). In formulating Plaintiff's RFC, the ALJ imposed the following mental limitations: can understand, carry out, and remember simple instructions and make simple work-related decisions; can occasionally interact with supervisors and co-workers; can never interact with the public; and can occasionally deal with changes in a routine work setting and perform work that does not require a production line pace, where co-workers' productivity is dependent on his productivity. (PageID.43). Before this Court, Plaintiff argues broadly that the ALJ's RFC determination is not supported by substantial evidence. (ECF No. 10, PageID.1544-52). For the reasons set forth below, to the extent Plaintiff is challenging the ALJ's findings as to his mental abilities, the Court finds merit to his argument.[5]

### 1. The Relevant Medical Evidence

There is no question that Plaintiff has experienced significant trauma in his life and that his mental health has been challenging to manage. Plaintiff began taking medication for mental impairments at age five, after he witnessed the death of his father, who overdosed on drugs. (PageID.1031-32). Plaintiff "played" with his father's dead body for

---

[5] Because the Court finds error in the ALJ's evaluation of Plaintiff's mental impairments, it will focus its discussion on medical evidence relevant to these conditions.

two days, and since that time, he has experienced visual and auditory hallucinations of his father telling him to harm himself or others.  (*Id.*).  He has been in prison multiple times, primarily for drug-related offenses, and was most recently paroled in September 2021.  He also has a history of several suicide attempts.  (PageID.689).

In her decision, the ALJ noted that records from the Michigan Department of Corrections ("MDOC"), dated September 9, 2021, indicated that Plaintiff's mental status examination was normal, and he had been diagnosed with substance abuse disorder (alcohol, cannabis, and cocaine) all in remission, antisocial personality disorder, PTSD, and bipolar disorder.  (PageID.44) (citing PageID.523-24).  This MDOC record also indicated, however, that although Plaintiff had been compliant with treatment, he had requested numerous and frequent medication changes and was currently taking Remeron, Zyprexa, and Effexor.  (PageID.523).

On September 29, 2021, not long after his release from prison, Plaintiff was brought to the emergency department at Covenant Hospital by his family after experiencing what they believed to be a psychotic break.  (PageID.624).  Plaintiff presented with flight of ideas, suicidal ideations, and was hyperverbal.  (*Id.*).  He was agitated, shouting out numbers with no further explanation, and asking God to strike down medical providers.  (*Id.*).   During his initial evaluation, he was inattentive, uncooperative, agitated, hyperactive, and aggressive.  (PageID.625).  Because his behavior was so disruptive and potentially harmful to himself, staff, and others, he had to be restrained.  (PageID.624).

Between September 30, 2021, and October 7, 2021, Plaintiff was hospitalized at HealthSource Saginaw (first on court petition, then voluntarily).  (PageID.649-70).  It was

noted there that, while he was in the emergency department, Plaintiff was manic, delusional, and paranoid, and made homicidal threats to the staff. (PageID.649). When first evaluated at HealthSource, Plaintiff was "pleasant, calm, and cooperative, presenting with pressured speech and elements of circumferential thought process that is linear at times, but also illogical intermittently." (PageID.650). He said he was in the emergency department for a day and a half, during which the staff "was threatening him and injecting him everywhere." (*Id.*). He was paranoid about what had been injected into his body and requested full bloodwork, labs, and x-rays to rule out anything suspicious – including a chip – having been placed inside him. (PageID.650-51). He endorsed racing thoughts, had tangential and pressured speech, and expressed that he felt he is "God's special messenger and he can also read everyone's minds." (*Id.*). He reported that he "questions everything" and feels that everyone is out to get him; he "never sees the general public because he always sneaks out at night with a mask so he doesn't have to worry about those encounters." (*Id.*). Throughout his hospitalization, he demonstrated mood lability with verbal outbursts and signs of irritability and agitation; at the time he was discharged, he was deemed low risk but continued to present with flight of ideas, pressured and tangential speech, paranoia, religious preoccupations, and delusions. (PageID.654).

Upon discharge, Plaintiff received outpatient mental health treatment through the Saginaw County Community Mental Health Authority ("SCCMHA"). On October 28, 2021, Plaintiff presented for an initial psychiatric visit with NP Lu but refused to answer any questions after he was told he would not be prescribed Adderall for his ADHD. (PageID.682). The ALJ correctly noted that, on December 15, 2021, Plaintiff had a

9

medication review with NP Lu, at which time he was somewhat fidgety and anxious with recent intact memory but poor remote memory.  (PageID.45) (citing PageID.777-84). What the ALJ failed to mention, however, is that at this same visit, Plaintiff reported difficulty sleeping, that he heard a voice "telling him to hurt himself a few days ago but he did not listen to it," that he was feeling paranoid, and that his Seroquel dosage was increased.[6] (PageID.778, 781).  At a February 9, 2022 medication review – which the ALJ did not mention – Plaintiff again reported hearing a voice telling him to hurt himself a few days earlier, feeling paranoid, and suffering from high anxiety.  (PageID.881-89).  The ALJ also made no mention of a March 23, 2022 medication review, at which Plaintiff reported that his auditory hallucinations were more like "whispers" after his Seroquel was increased, but he continued to experience flashbacks.  (PageID.872-80).  His Seroquel dosage was changed, and he was continued on Effexor, Remeron, and Buspar.  (*Id.*).

Plaintiff was seen for another medication review on May 12, 2022; as the ALJ noted, his mental status examination "was essentially normal except he was irritable and defensive when discussi[ng] substance use; his recent memory was intact and remote memory poor." (PageID.45) (citing PageID.1035).  His medications were continued.  Plaintiff attended several additional appointments at SCCMHA in 2022, none of which were discussed by the ALJ.  For example, Plaintiff underwent a psychiatric evaluation with NP Lu on June 29, 2022.  (PageID.1049-60).  During this evaluation, Plaintiff reported that "a lot of his friends [in] Saginaw have been murdered and he is afraid to be out so he stays indoors."

---

[6] At this visit, Plaintiff also reported a history of command auditory hallucinations, saying "the voices told me to shoot my cousin and I shot him when I was 18[.]"  (PageID.781).

(PageID.1050).  He reported continued flashbacks about witnessing rapes and murders in prison, as well as auditory hallucinations, but he said Seroquel was helping him "not act on the voices."  (PageID.1051).  At a September 1, 2022 medication review, Plaintiff reported low energy and said that he had been taking Seroquel only once per day.  (PageID.1452).  He rated his mood at 4/10, reported nightmares, and said "he heard a voice telling him to go into the lake one day," but he did not listen to it.  (PageID.1453).  NP Lu stressed the importance of taking Seroquel twice per day, as prescribed, after Plaintiff admitted "he was confused with this previously."  (PageID.1458).  The next month, on October 20, 2022, Plaintiff indicated that his current medications were "working well," but he reported feeling traumatized by the September 2021 encounter with the police in the emergency department.  (PageID.1443).  He again rated his mood at 4/10, and his medications were continued.  (PageID.1444, 1448).

Plaintiff attended appointments at SCCMHA throughout 2023, six of which the ALJ specifically discussed, but only in part, as detailed below:

- January 11, 2023: The ALJ noted that, at this medication review, Plaintiff's mental status examination was "essentially normal with euthymic mood and no indication of psychosis or memory loss[.]"  (PageID.46).  At this same appointment, however, Plaintiff reported getting into a physical altercation when his nephew "threatened" him.  (PageID.1434).

- March 22, 2023: The ALJ noted that at this medication review, Plaintiff's mental status examination "was essentially normal except for anxious and dysphoric mood[.]"  (PageID.46) (citing PageID.1429).  What the ALJ did not mention, however, is that Plaintiff reported that he had "not been leaving the house often" because, approximately 1.5 months earlier, he saw the police officer involved in his September 2021 hospitalization, which had "caused a lot of anxiety and flashbacks."  (PageID.1425).  He further reported that he had "not been feeling comfortable enough to do catering jobs, not wanting to leave the home."  (Id.).  He rated his mood at 2/10, said he was

11

afraid he was going to die when he saw the police officer, and reported not wanting to sleep at night due to a fear of nightmares.  (PageID.1426). Moreover, the ALJ did not mention that Plaintiff's Seroquel dosage was increased to address his increased anxiety and prevent auditory and visual hallucinations.  (PageID.1430).

- May 18, 2023: The ALJ noted that, at this medication review, Plaintiff indicated he felt traumatized by a recent shooting in his neighborhood, but his mental status examination was "essentially normal" other than becoming "anxious and irritable" when talking about this incident.  (PageID.46) (citing PageID.1416).  The ALJ did not mention, however, that Plaintiff reported becoming upset when a police officer pulled him over; that he needed his girlfriend to help him with his medications; that he rated his mood at 1/10; that he admitted hearing "his dad's voice in [a] demonic tone when he is alone or when someone is getting aggressive towards him"; that he had "thoughts of punching others"; and that he was experiencing poor sleep due to fears of nightmares.  (PageID.1416, 1417, 1421).  The ALJ also did not mention that Plaintiff was restarted on Depakote, and his Seroquel dosage was again increased.  (PageID.1422).

- June 21, 2023: The ALJ indicated only that this psychiatric note "indicated [Plaintiff] had forgotten to take his medication[.]"  (PageID.46) (citing PageID.1407).  What the ALJ did not mention, however, is that Plaintiff said his mother was helping him manage his medications; he was having racing thoughts, flashbacks, and nightmares more frequently after his sister died; he rated his mood at 3/10; and that a "higher level of care was recommended." (PageID.1407, 1408, 1412).

- August 9, 2023: The ALJ referenced this medication review, indicating only that Plaintiff said he was going to get a catering job.  (PageID.46).  The ALJ did not mention that, on mental status examination, Plaintiff had an anxious mood and was experiencing chest pain in that state.  (PageID.1402-03).

- September 27, 2023: The ALJ noted that Plaintiff indicated he did not hear voices as much when he took his medication, but that he was anxious and irritable on examination and reported hearing voices telling him to hurt himself, despite taking Seroquel correctly.  (PageID.46) (citing PageID.1387, 1393).  What the ALJ left out, however, was Plaintiff's report that when he learned he could be facing a felony charge for bouncing a check, "he started feeling like he heard his dad's voice telling him to hurt himself …."  (PageID.1387).  He also reported poor sleep and racing thoughts; it was recommended he restart individual therapy; and his Depakote was increased "for mood stabilization."  (PageID.1388, 1393).

12

In terms of medical opinion evidence, on June 14, 2022, state agency psychological consultant Natalie Rea-Michalak, Psy.D. reviewed Plaintiff's records and opined that he is moderately limited in the ability to understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage himself. (PageID.115).  She further opined that he retains the mental ability to perform simple work activities.  (PageID.119).  On October 21, 2022, these opinions were adopted at the reconsideration level by state agency psychological consultant Jerry Csokasy, Ph.D., with the following additional limitations: "He can understand, carry out, and remember simple instructions and make simple, work-related decisions.  He can occasionally interact with supervisors and co-workers.  He can never interact with the public.  He can occasionally deal with changes in a routine work setting and perform work that does not require a production line pace, where co-workers' productivity is dependent on the claimant's productivity."  (PageID.125-30).

> ### 2.    The ALJ's Evaluation of the Medical Evidence
> ### is Not Supported by Substantial Evidence

In his motion, Plaintiff argues that the "RFC determination is not supported by substantial evidence." (ECF No. 10, PageID.1544).  At the hearing stage, the ALJ is solely responsible for deciding the claimant's RFC. *See* 20 C.F.R. § 416.946(c).  In reaching that determination, the ALJ must consider the functional limitations resulting from the claimant's medically determinable impairments. *See Social Security Ruling* ("SSR") 96-8p, 1996 WL 374184, at *1 (July 2, 1996).  Plaintiff, however, carries the burden of

establishing his RFC, including showing that he has̶d̶ greater limitations than those assessed by the ALJ. *See Jordan v. Comm'r of Soc. Sec.*, 548 F.3d 417, 423 (6th Cir. 2008).

As set forth above, the ALJ included the following mental limitations in Plaintiff's RFC: can understand, carry out, and remember simple instructions and make simple work-related decisions; can occasionally interact with supervisors and co-workers; can never interact with the public; and can occasionally deal with changes in a routine work setting and perform work that does not require a production line pace, where co-workers' productivity is dependent on his productivity. (PageID.43). Plaintiff now alleges that this mental RFC is not supported by substantial evidence because the ALJ improperly evaluated the medical evidence[7] and discounted his subjective testimony. (ECF No. 10, PageID.1545-52). The Court agrees.

---

[7] In connection with this argument, Plaintiff maintains that the ALJ erred in failing to consider the psychological consultative examination he underwent with Michael Brady, Ph.D. on September 9, 2008, in connection with a prior application for benefits. (ECF No. 10, PageID.1545-47). Plaintiff acknowledges that Dr. Brady's opinion predates the onset of disability in the instant case (by some 13 years) but argues that it is particularly relevant "given the lifelong nature of [his] impairments." (*Id.*, PageID.1545). The Court is not persuaded that the ALJ's failure to discuss this examination – on its own – warrants remand, given that: (1) Plaintiff fails to explain how the 2008 examination reflects his functioning during the relevant period; (2) the opinion pertains to periods already adjudicated; (3) the state agency consultants considered Dr. Brady's examination when reviewing Plaintiff's records in this case; and (4) Plaintiff fails to identify specific functional limitations the 2008 examination establishes. However, given that Plaintiff's mental impairments can be traced back to his childhood, the 2008 examination does provide insight into the longevity and severity of his symptoms over time. Thus, on remand, the ALJ should consider and discuss this evidence.

Similarly, Plaintiff argues that where the state agency psychological consultants only considered his medical history into 2022, the ALJ had a duty to develop the record by obtaining updated opinion evidence that reflected the full progression of Plaintiff's mental impairments. (E̶C̶F̶ ̶N̶o̶.̶ ̶1̶0̶*Id.*, PageID.1547-49). However, "[t]here is no categorical requirement that the non-treating source's opinion be based on a 'complete' or 'more detailed and comprehensive' case record." *Helm v. Comm'r of Soc. Sec.*, 405 F. App'x 997, 1002 (6th Cir. 2011). Here, where the ALJ herself discussed much of the evidence that was not before the state agency consultants – albeit in a

14

Here, the ALJ's analysis of the objective medical evidence omits mention of so many critical records (or portions of records) that the Court cannot conclude that it is supported by substantial evidence. While the Court acknowledges that the ALJ need not discuss every piece of evidence submitted, *see Kornecky*, 167 F. App'x at 508, this particular case presents a situation where the quality and volume of evidence not discussed by the ALJ raises serious doubts about the supportability of the ALJ's RFC finding.

As set forth in detail above, *supra* at 7-13, the record shows that Plaintiff began taking medication for mental impairments at age five, after he witnessed the death of his father. Since that time, he has experienced visual and auditory hallucinations of his father telling him to harm himself or others, and he has attempted suicide on multiple occasions. As the ALJ noted, on September 29, 2021 — which shortly before Plaintiff's application date – Plaintiff was brought to the emergency department by his family after experiencing what they believed to be a psychotic break. (PageID.624). At the time, he was manic, delusional, and paranoid, and made homicidal threats to staff. (PageID.649). He was subsequently hospitalized at HealthSource Saginaw for approximately one week. (PageID.649-70). At that time, he was paranoid about what had been injected into his body in the hospital, and he requested full labs and x-rays to rule out anything suspicious – including a chip – having been placed inside him. (PageID.650-51). He endorsed racing thoughts, had tangential and pressured speech, and expressed that he felt he was "God's

---

problematic manner, *see infra* at 15-189 – the Court finds no error in the ALJ's decision to rely on the evidence in the record. Again, however, on remand, the ALJ should consider whether an updated consultative examination is warranted.

special messenger and he can also read everyone's minds." (*Id.*). He reported that he "questions everything" and feels that everyone is out to get him, and he never sees the general public "because he sneaks out at night with a mask so he doesn't have to worry about those encounters." (*Id.*). At the time he was discharged, he continued to present with flight of ideas, pressured and tangential speech, paranoia, religious preoccupations, and delusions. (PageID.654).

From October 2021 through at least September 2023, Plaintiff received outpatient mental health treatment through SCCMHA. While the ALJ discussed many of Plaintiff's SCCMHA treatment records, she omitted numerous significant aspects of those records which, if meaningfully analyzed, may well lead to a different conclusion about Plaintiff's mental limitations and his ability to perform full-time work on an ongoing and sustained basis. For example, while the ALJ correctly noted that, at a December 15, 2021 medication review, Plaintiff was "somewhat fidgety and anxious at times" with recent intact memory but poor remote memory (PageID.45), she made no mention of the fact that at this same visit, Plaintiff reported hearing a voice "telling him to hurt himself a few days ago," said he was feeling paranoid, and that, as a result, his Seroquel dosage was increased. (PageID.777-84). The ALJ also made no mention of notes from February and March 2022 medication reviews where Plaintiff again reported auditory hallucinations, feeling paranoid, experiencing flashbacks, and suffering from high anxiety, all of which resulted in adjustments to his Seroquel prescription. (PageID.872-89).

Other than a brief discussion of Plaintiff's May 2022 medication review (PageID.45), the ALJ made no mention of several additional appointments Plaintiff

16

attended at SCCMHA in 2022, all of which demonstrated ongoing significant difficulties in Plaintiff's mental functioning.  For example, during a June 2022 psychiatric evaluation, Plaintiff reported that "a lot of his friends [in] Saginaw have been murdered and he is afraid to be out so he stays indoors." (PageID.1049).  He reported continued flashbacks about witnessing rapes and murders in prison, as well as auditory hallucinations, but said Seroquel was helping him "not act on the voices." (PageID.1051).  In September 2022, Plaintiff reported nightmares and said he "heard a voice telling him to go into the lake one day." (PageID.1453).  The next month, Plaintiff reported feeling traumatized by the September 2021 encounter with police in the emergency department.  (PageID.1443).

Similarly, Plaintiff attended appointments at SCCMHA throughout 2023, six of which the ALJ specifically discussed.  As summarized above, however, while the ALJ mentioned portions of each of the ~~related~~ relevant records, she failed to discuss critical information, which – given the nature and extent of such omissions – prevents the Court from performing its substantial evidence review.  For example, the ALJ failed to mention that: (1) in March 2023, Plaintiff reported that he had "not been leaving the house often" because, approximately 1.5 months earlier, he saw the police officer involved in his September 2021 hospitalization, which had "caused a lot of anxiety and flashbacks" and resulted in an increase in his Seroquel dosage (PageID.1425, 1430); (2) in May 2023, Plaintiff reported hearing "his dad's voice in [a] demonic tone when he is alone or when someone is getting aggressive towards him," he was restarted on Depakote, and his Seroquel dosage was again increased (PageID.1417, 1421-22); (3) in June 2023, the ALJ indicated only that Plaintiff "had forgotten to take his medication" (PageID.46), omitting

17

mention that Plaintiff was experiencing flashbacks and nightmares more frequently after his sister died, and a "higher level of care was recommended" (PageID.1407, 1412); and (4) in September 2023, when Plaintiff learned he could be facing a felony charge for bouncing a check, "he started feeling like he heard his dad's voice telling him to hurt himself," he reported poor sleep and racing thoughts, and his Depakote was increased "for mood stabilization" (PageID.1387, 1388, 1393). On the whole, then, the ALJ's discussion does not reflect an even weighing of the competing evidence.

In sum, while an ALJ need not address every piece of evidence in the record, *Kornecky*, 167 F. App'x at 508, she does not fairly discharge her duties when she fails to discuss significant contradictory portions of the very records on which she relies the most. *See Minor v. Comm'r of Soc. Sec.*, 513 F. App'x 417, 435 (6th Cir. 2013) (citing *Germany-Johnson v. Comm'r of Soc. Sec.*, 313 F. App'x 771, 778 (6th Cir. 2008) and *Boulis-Gasche v. Comm'r of Soc. Sec.*, 451 F. App'x 488, 494 (6th Cir. 2011)). Here, for the reasons discussed above, the Court finds that Plaintiff is entitled to a more even and thorough evaluation and discussion of the record evidence, and that consequently, the ALJ's analysis of the relevant medical evidence, and subsequent RFC finding, are not supported by substantial evidence. As such, remand is required.[8]

---

[8] Plaintiff also argues that the ALJ erred in discounting his subjective symptom testimony, at least in part, because of his "noncompliance with medication[.]" (ECF No. 10, PageID.1551). It does appear, as Plaintiff asserts, that the ALJ referenced such noncompliance in drawing a negative inference about the disabling nature of his mental impairments. (PageID.46 ("[Plaintiff] required hospitalization after his release from prison in 2021 but it was also noted he was not compliant with treatment.")). Courts have recognized, however, that for individuals suffering from mental illness, noncompliance with treatment could be a *symptom* of the condition itself, rather than evidence the condition is not disabling. *See White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 283 (6th

**E.      Conclusion**

For the foregoing reasons, the Court **DENIES** the Commissioner's Motion for Summary Judgment **(ECF No. 12)**; **GRANTS** Plaintiff's Motion for Summary Judgment **(ECF No. 10)**; and, pursuant to sentence four of 42 U.S.C. § 405(g), **REMANDS** this case to the ALJ for further proceedings consistent with this Opinion and Order.

**IT IS SO ORDERED.**

Dated: March 23, 2026                                   s/David R. Grand
Ann Arbor, Michigan                                    DAVID R. GRAND
                                                       United States Magistrate Judge

**<u>CERTIFICATE OF SERVICE</u>**

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on March 23, 2026.

                                                       s/Eddrey O. Butts
                                                       EDDREY O. BUTTS
                                                       Case Manager

---

Cir. 2009) ("For some mental disorders, the very failure to seek treatment is simply another symptom of the disorder itself."); *Blankenship v. Bowen*, 874 F.2d 1116, 1124 (6th Cir. 1989) (it is a questionable practice to chastise one with a mental impairment for the exercise of poor judgment in seeking rehabilitation).  The Commissioner argues that Plaintiff failed to present any evidence substantiating this argument (ECF No. 12, PageID.1573), but the record contains evidence that Plaintiff was "confused" about how and when to take his medications and, later, that he sought help from his girlfriend and mother with managing his medications.  (PageID.1407, 1416, 1458).  Moreover, both Plaintiff and his mother indicated in function reports that Plaintiff requires assistance remembering to take his medication.  (PageID.280, 288).  Finally, to the extent the ALJ implied that Plaintiff's mental health symptoms were ~~managed~~ controlled with medication, significant record evidence indicates just the opposite.  (PageID.1393 (still having high anxiety and auditory hallucinations in September 2023, despite taking medication correctly), PageID.65 (Plaintiff's hearing testimony that he still hears voices despite increased dosages of Seroquel)).  On remand, the ALJ should consider whether Plaintiff's medication compliance was a symptom of his conditions, rather than evidence that those conditions were not disabling.

19